## UNITED STATES v. CENTRAL WHARF TOWBOAT CO. et al.

(Circuit Court of Appeals, First Circuit. December 26, 1924.)

### No. 1790.

Salvage ⚖=27—Decree awarding salvage, held not erroneous or excessive.

Findings as to value of salvaged vessel and of two tugs and revenue cutter saving her, the degree of danger involved and proportionate service rendered *held* not clearly wrong, and salvage allowance of $9,000 to the tugs, valued at $50,000 and $25,000, not grossly excessive or contrary to law; the vessel being valued at $70,000.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in admiralty for salvage by the Central Wharf Towboat Company and the Saco River Towing Company, owners of the steam tug Cumberland, and A. G. Prentiss, respectively, against the United States, owner of the steamship Annahuac. From a decree for libelants (295 F. 346), respondent appeals. Affirmed.

Arthur M. Boal, Asst. Admiralty Counsel, U. S. Shipping Board, of Washington, D. C. (Frederick R. Dyer, U. S. Atty., and William B. Nulty, Asst. U. S. Atty., both of Portland, Me., on the brief), for the United States.

Nathan W. Thompson, of Portland, Me. (Thompson, Hoague & Hill, of Portland, Me., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is an appeal by the United States, respondent and owner of the steamer Annahuac, from a decree in an admiralty proceeding brought in the federal District Court for Maine by the appellees (libelants), owners respectively of the steam tugs Cumberland and Prentiss, in their own behalf and that of their crews, for salvage services. The two libelants joined in the libel, and the award is to be divided between them in accordance with an agreement.

In its assignment of errors the appellant complains that the court erred in holding that the salvage value of the Annahuac was $70,000; in finding that the values of the tugs Cumberland and Prentiss were in the vicinity of $50,000 and $25,000 respectively; that practically all the dangers of the salvage services were taken by the tugs Cumberland and Prentiss; that the revenue cutter Ossipee was unable to get in as near the shore as the tugs; that the revenue cutter could not have floated the Annahuac without the aid of the tugs; in failing to find that the tugs Cumberland and Prentiss could not have floated the Annahuac without the aid of the revenue cutter; in finding that the greater part of the service was rendered by the tugs; in making a total salvage award of $15,000; in holding that the tugs were entitled to three-fifths of the total salvage award; and in entering decree for $9,000.

It appears that the steamer Annahuac, on the evening of April 15, 1923, when off the coast of Maine, encountered a severe southeast snowstorm, lost her bearings, and struck heavily on the ragged ledges of Fortune's Rocks near Biddeford Pool; that, in trying to get off the ledges on her own power, the blades of her propeller were stripped and her rudder jammed hard to starboard; that the master and crew left the steamer and went to the Coast Guard Station at Fletcher's Neck, where they stayed the remainder of the night, arriving there about midnight; that the next morning the steamtugs Prentiss and Cumberland arrived in the vicinity of the wreck, and thereafter, shortly before high tide, the revenue cutter Ossipee; that at that time the Annahuac lay in shore with her stern and counter exposed to the sea and listing to starboard; that the Prentiss arrived first, the Cumberland about an hour later, and the revenue cutter shortly before noon. When the Prentiss arrived the Annahuac began to pound, being thrown up by the sea, and, as the violence of the sea continued to increase, she pounded harder. When the cutter first arrived she stopped from a quarter of a mile to a mile from the wreck (the testimony in this regard varying) and dropped anchor, as her bearings showed that she had reached the "danger angle" beyond which it was not safe to go. As the cutter desired to reach a point from 100 to 200 fathoms from the wreck, the services of the Prentiss, whose captain, Goldthwaite, was thoroughly familiar with the ledges in that vicinity, were obtained to pilot the cutter further in, which it did, taking her to within 100 or 120 fathoms of the wreck. At this time the tide was beginning to ebb, and time was important if the Annahuac was to be floated on that tide. And the evidence showed that she would have been smashed to pieces on the rocks if she had not been floated at that time, as the violence of the storm was continually increasing; that, after the cutter had been piloted

in the desired distance by the Prentiss, a hauser of from 100 to 120 fathoms was run from the cutter to the Annahuac by the coast guard crew, their surfboat being towed in about half way by a power boat; that the power boat did not dare to go further, and the coast guard crew rowed the balance of the distance; that, the hauser being attached to the stern of the Annahuac, all three vessels pulled, and, aided by an unusually heavy sea that struck and lifted her up above the surrounding rocks, they were able to pull her off. This occurred within 20 minutes or a half an hour after they started pulling. In pulling her off the tugs had towlines attached to the stem of the cutter to keep her head up and from getting into danger.

The vessel having been removed from the ledge, the Cumberland attached a line to her bow, and started to tow her to Portland, a distance of some 20 miles. At this time the Annahuac had a list to starboard, was down at the head, her rudder was jammed hard to starboard, and the sea was such as to cause her and the towboats to roll badly. Shortly after starting it was found that the Cumberland could not control her, as the Annahuac would yaw up on the Cumberland's port beam, and then run up on the Cumberland's starboard beam, and in doing so would bring the towline across the quarter of the towboat, and when this occurred on a large sea it would trip the towboat to such an extent that the water would go over her rail. Such being the situation, the Prentiss ran a line from her stem to the stern of the Annahuac, and endeavored to maneuver in such a way as to keep her straight and make her follow the Cumberland. While this aided the towing somewhat, it was still difficult, and when the Annahuac would yaw a tremendous strain would be put upon the line of each vessel, pulling the tugs down until water came over their rails. Because of this a man was stationed at the lines on each tug with an axe, and with instructions to cut them on signal. On the way to Portland the tow line of the Prentiss parted three or four times, and that of the Cumberland twice, and the cutter, which took the place of the Prentiss for a short while, parted her line. When such occurrences took place the towboats had extreme difficulty in controlling her. In fact, the evidence shows that on this trip the tugs encountered difficulties and dangers out of the ordinary, and as they approached Portland the list of the Annahuac to starboard had increased to 45 degrees, and she was still further down at the head.

In view of the foregoing, we are of the opinion the District Court was right in finding that the greater part of the service was rendered by the tugs; that they could get nearer to the shore than the cutter; that without their aid the cutter could not have floated the Annahuac; and that the assignments of error relating to these matters should be denied.

Neither do we think that the court erred in finding that the value of the Cumberland was in the vicinity of $50,000 and that of the Prentiss in the vicinity of $25,000, or in finding that the dangers which they encountered were far greater than those of the cutter.

The evidence submitted as to the value of the Annahuac was far from satisfactory. The contractor who towed her after the accident from Portland to Boston, where she was repaired, was required to and did insure her in the sum of $100,000. After repairs were made costing about $45,000, she was sold at private sale for $95,500. An expert testified that her salvage value was $70,000. The private offers obtained by the government for her in her damaged condition lend little aid upon the question of her salvage value. None of them were accepted, and the largest cash offer was apparently made to cover the minimum suggested by the government. The testimony of the expert that her salvage value was $70,000, taken with the price she was sold for after the repairs were made, and the amount of the insurance the contractor was required to put on her while towing her to Boston, comprise the only evidence submitted that lends any material aid to the determination of the question, and, in view of it, we are unable to say that the court below was clearly wrong in reaching the conclusion it did.

The assignment that the court erred in making a total salvage award of $15,000 is not in accordance with the fact, for it did not make a salvage award of $15,000. The only award that it made was for $9,000 to the Cumberland and Prentiss, which happened to be three-fifths of $15,000 which the court, in its process of reasoning, estimated the sum at which the total salvage ought to be considered, provided all the salvors who rendered services claimed and were entitled to claim pay for their services. The cutter, being a government boat, was not entitled to pay for its services and the coast guard and power boat made no claim, and, so far

as appears, stood in no better position to make a claim than the cutter.

· We are unable to see wherein the District Court in fixing the amount of the award violated any rule of law applicable to the case, or that its findings were clearly wrong, or the award grossly excessive. See Santa Rita (C. C. A.) 281 F. 760, and cases there cited.

The decree of the District Court is affirmed, with costs to the appellees.