Joseph W. NOLAN, Charles O. Keagy, Jr., Earl F. Wingert, Ralph W. Belmore, William D. Eveland, James K. Stellos, Charles W. Snyder, Thomas H. Grissom, Frank C. Richardson, Walter E. Shannon, Jr., Bernard M. Baldomar, Virgil W. Keith, Charles F. Bartlett, George P. Epting, Appellants,

v.

A. H. BASSE REDERIAKTIESELSKAB and Pennsylvania Salt Manufacturing Co., Inc.

No. 12722.

United States Court of Appeals Third Circuit.

Argued Jan. 6, 1959.

Decided June 11, 1959.

Henry E. Howell, Jr., Norfolk, Va. (Freedman, Landy & Lorry, Philadelphia, Pa., Jett, Sykes & Howell, Norfolk, Va., on the brief), for appellants.

J. Welles Henderson, Jr., Philadelphia, Pa. (Rawle & Henderson, Harrison G. Kildare, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and STALEY, Circuit Judges.

BIGGS, Chief Judge.

The plaintiffs-appellants, fourteen members [1] of the crew of an Army tug, "LT-1953", sought an award for salvage by reason of their efforts in saving a cargo of cryolite ore laden aboard the Danish vessel the "Else Basse". The appellants were granted specific authority by the United States Army to bring the suit at bar. The libel was filed against A. H. Basse Rederiaktieselskab, the shipowner, but since that corporation was not amenable to process, the case was proceeded with against Pennsylvania Salt Manufacturing Co., Inc. (Pennsalt), the owner of the cargo. After the appellants filed the suit at bar in 1954 forty-six members of the United States Navy LST-287 who assisted in the salvage operation filed their libel. Answers were made by Pennsalt and the cases were tried together. The court below entered a final decree awarding salvage as hereinafter appears to the appellants and to the crew of the Navy LST as well. The crew of the Navy LST have not appealed from the amounts awarded them but the crew of the Army LT have appealed on the ground that the awards made to them by the court below are insufficient. [2]

The Else Basse was a small cargo vessel, about 270 feet in length and registered at approximately 1,400 gross tons. She was chartered by Pennsalt to transport raw cryolite ore, a non-combustible mineral used in the manufacture of aluminum, from Greenland. The Else Basse, en route to Philadelphia, was approximately fifty miles off the coast of Newfoundland when fire was discovered in her engine room. The date was August 18, 1953; the time, 9:30 P.M. The crew of the Else Basse fought the fire without success and approximately two hours later Captain Jakobsen ordered all hands to leave the ship, excepting the Chief Engineer and the Chief Mate. Near midnight, these two officers and the Captain, fearing an explosion in the ship's settling tanks from the heat of the fire, the outside plates having become "red hot", also left the ship. A distress call had been dispatched earlier to which the S. S. Cornerbrook responded. The Cornerbrook picked up the crew and passenger of the Else Basse. According to Captain Jakobsen the sea was calm but a heavy rain was falling. In response to questions as to whether he expected to return to the Else Basse, he said, "Stay around the ship and let the ship burn out. * * *" But he stated also that he left the scene on the Cornerbrook because of his concern for the safety of his crew. At this time the fire was still raging aboard the Else Basse.

At about one o'clock in the morning of August 19, the Army Tug LT-1953, in port at Harmon Air Force Base, Newfoundland, put out to aid the Else Basse. The LT was especially equipped for firefighting, having aboard three fire monitors. Before the LT arrived the United States Navy vessel, the LST-287, had already appeared and at 3:40 A.M. was standing by the burning Else Basse. About two hours later, at 5:30 A.M., the LT arrived and, at a distance of about 200 feet, proceeded to play streams of water upon the Else Basse. Neither of the government vessels ventured closer since at that time the nature of the Else

---

1. Although the caption of the complaint filed in the District Court indicates only thirteen crew members, one additional member, George P. Epting, was permitted by stipulation to join in the suit as party libellant.

2. The opinion of the court below is reported D.C.E.D.Pa.1958, at 164 F.Supp. 774.

Basse's cargo was unknown. The LT, maneuvering and constantly hurling water on the blazing vessel, by 7 o'clock had put out all visible flames. The LST's fire-fighting apparatus was far less powerful, and that ship did not, either before or after the arrival of the LT, attempt then to fight the fire. By this time the nature of the cargo of the Else Basse had been ascertained by radio and the second phase of the rescue operation began.

Captain Nolan of the LT decided to take the Else Basse in tow and brought his vessel under her port bow. In answer to Captain Nolan's request, crew members Wingert and Keith volunteered to board the Else Basse to secure the towing gear. The sea was moderate. With the two ships alternately rising and falling on three to four foot swells, and as the LT was going up and the Else Basse down, the two seamen jumped from one ship to the other. After securing the gear Wingert and Keith, by sliding down ropes, returned to the LT.

The LT then maneuvered away from the Else Basse and began the towing. Shortly thereafter an outburst of fire appeared aboard the Else Basse. Apparently then for the first time, the LST sprayed water on the ship. According to Captain Barrett of the LST, his ship stood five to twenty-five feet off the Else Basse. About 9 or 9:30 A.M., the LST requested the LT to head the Else Basse into the wind to reduce her yawing so that the two ships, the LST and the Else Basse, could be tied together. This was done, and lines at the bow and the stern of the Else Basse were secured to corresponding positions on the LST. Four crew members of the LST had boarded the Else Basse to engage the lines. Eleven crewmen of the LST then boarded the Else Basse, fire hoses were passed to them, and they proceeded to extinguish what fires there were in the interior parts of the ship. At 11:15 A.M. these men were recalled and Captain Barrett posted a fire watch aboard the Else Basse.

By marrying the Else Basse to the LST the speed of the tow was considerably increased, and the three ships reached harbor at Harmon Air Force Base at three o'clock in the afternoon. The LT dropped its tow and the LST continued with the Else Basse several miles to the place of anchorage.

The third and last phase of the salvage activities for which the crew members of the LT claim compensation is the maintenance of a fire-watch on the Else Basse during the following two or three weeks. There was posted shortly after the Else Basse arrived a security guard from the Air Force Base, but nevertheless Captain Nolan, believing that further safeguards were required, returned the evening of the 19th with the LT. Upon arrival, he and Chief Engineer Keagy boarded the Else Basse to inspect the ship. For the following fortnight or so, to use Captain Nolan's own term, the LT returned "intermittently" to the Else Basse. Apparently most of the time spent in standing by the Else Basse was during the night hours.

A gross salvage award of $10,100 was made by the court below, and was divided among the 60 co-salvors as shown in the following schedule. The court made no division by ships.

| | |
|---|---|
| To the Masters of the two Government vessels, $400 each | $   800 |
| To the two men from the tug and the four men from the LST who first went aboard the Else Basse in order to secure lines to her, $400 each | $ 2400 |
| To the eleven men from the LST who boarded the Else Basse and engaged in extinguishing the fire, $200 each | $ 2200 |
| To the remaining claimants, $100 each | $ 4100 |
| To Feleggi, a crew member of the LST who was injured during the course of the salvage, an additional $600 | $   600 |
| Total | $10,100 |

This appeal raises two major inquiries. First, did the court below correctly determine the value of the cargo?[3]

Approximately 2000 tons of cryolite ore were carried by the Else Basse, and the cost of the cargo at the point of loading was $95,324.37 f. o. b. Greenland. The ocean freight was $15,166.76 and the cost of the insurance premium was $276.-92. But Pennsalt asserted at trial that since pursuant to a general average adjustment the cargo was required to contribute $20,173.77, the net value of the cargo amounted to $75,150.60.

Pennsalt, the sole United States importer of natural cryolite ore, established in 1950 a fifteen year contract with its Greenland supplier, Oresund. The contract specified that a minimum amount of 8,000 tons of ore would change hands in each calendar year for which the cost was to be $55 per ton, based on ore of 75% purity. For each additional 1,000 tons thereafter, to a maximum of 25,000 tons, the cost was to be increased $1 per ton. But neither buyer nor seller were bound to purchase or sell any quantity above the minimum. The contract specified that the total amount to be purchased during the calendar year had to be established early in the year.

During 1953, Pennsalt purchased a total of 16,000 tons of cryolite ore, 9,000 tons being purchased under the price arrangements as specified in the contract described above. The remaining 7,000 tons were purchased at $125 per ton. The ore carried by the Else Basse was within the first 9,000 tons purchased, and so was invoiced at a much lower price than shipments made under the arrangements for the last 7,000 tons of ore. The court below found that the value of the cargo was $95,324.37. The invoice price of the next cargo of ore, only 60 more tons than the Else Basse carried, was $201,699.56, representing approximately 602 tons at the $55 price and 1481 tons at the $125 price, as adjusted for purity of ore. The appellants assert that the value of the salved cargo should have been put at $200,000. The reason assigned is that the standard for measuring value is the value to the owner, and Pennsalt, had it been put to replacing the cargo, would have had to have paid the advanced price.

The appellee insists that the determination by the court below is correct. The 7,000 tons were purchased, according to the testimony of Mr. Penfield, secretary of Pennsalt, under special conditions[4] arising out of the Korean emergency, at a price backed by the United States Government's assurance of a higher price for the finished product.[5] It further appears that the Pennsalt firm had, near the end of 1953, a stockpile of over ten thousand tons of ore. Mr. Penfield also testified that Pennsalt, if it had lost the cargo, would not have paid the advanced price of $125 per ton to replace that shipment.[6]

We think that the court below did not err in setting the value of the cargo at its invoice price. Ordinarily, the market value of the property determines the value of the cargo for the salvage award. Norris, Salvage § 263 (1958). But since no market existed from which a value could be established some other method

---

3. The value of the property salved is of course one of the elements in the determination of the amount of the salvage award. The Blackwall, 1869, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870.

4. On direct examination, Mr. Penfield testified as follows:
"By Mr. Mahoney:
"Q. Why is it that this special deal was made to pay $125 per ton for 7000 tons in 1953? A. Well, it grew out of the Korean emergency.
"Q. Why did you agree to pay $125 per ton when you had a perfectly good contract that entitled you to pay a much lower price? A. For the simple reason that the vendor wouldn't sell any more than 9000 under the contract.
"Q. Could you point out the provision in the contract, or is there any provision in the contract where the vendor could refuse to sell?
"The Court: Well, yes. As I understand he was only bound to sell 8000. After that it was a question of mutual agreement." Record at p. 365.

5. Record at p. 381.

6. Record at p. 406.

for determination had to be employed. But we cannot employ the replacement value, which the appellants assert is the true "value to the owner." Suppose that the cargo salvaged had been the last shipped in 1953. It would then have to be priced at $125 per ton. The next shipment would be priced at $55 per ton, since the new year would again start the scaled price arrangement at the minimum.[7] Would the appellants assert that the value of the cargo for salvage purposes would be the replacement cost and urge that the cost of the next shipment, viz., $55 per ton, should determine the value of the salved cargo? We think not. Furthermore, there is little evidence to prove that this particular cargo of ore would have been replaced had it been lost, and the testimony of Mr. Penfield in fact indicates the contrary.

The pricing provisions in the contract between Pennsalt and Oresund and the circumstances under which the parties negotiated for the additional 7,000 tons in 1953 are unusual, and we do not think it unreasonable for the court below to have held that the value of this particular cargo was the price at which the parties were willing to buy and sell.

■ Moreover, the burden of establishing the value of the cargo is on the libellants. Cf. Lincoln S. S. Line v. United States, 2 Cir., 1925, 7 F.2d 886. The evidence is insufficient to demonstrate that the value of the cargo to Pennsalt was $200,000. There was considerable testimony relating to the nature of the contractual arrangements between Oresund and Pennsalt and the values of successive cargoes but it has not been demonstrated that anything other than the price at which Oresund and Pennsalt exchanged the ore aboard the Else Basse should be the criterion for establishing value. The appellants have not cited to us cases, nor have we found any, which, in the field of salvage, rely upon replacement cost as

the determinant of value.[8] Nor do we think that the appellants have sustained the burden of showing any necessity of replacement in the event that the cargo was lost. Cf. National Distillers Prod. v. Companhia Nacional, D.C.E.D.Pa.1952, 107 F.Supp. 65, at page 70.

■ Although we apply the "value to the owner" test urged by the appellants, we are not constrained to fix the cargo of the Else Basse at any value greater than the invoice cost. Under the circumstances at bar we think the invoice cost represents the value to the owner.

We now proceed to the next issue, viz., was the amount awarded to the crew members of the LT properly established under the principles of the law of salvage?

■ The court below considered and applied the elements to be considered in fixing the amount of salvage as they are set out in The Blackwall, 1869, 10 Wall. 1, at pages 13, 14, 77 U.S. 1, 19 L.Ed. 870. The Supreme Court stated: "Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service: (1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

One of the elements, the value of the property saved has already been discussed. The remaining elements, imponderables at best, were each considered by the court below. The court took up

---

7. There is evidence that the contract was amended for 1954 and subsequent years, but we do not consider the change material to our discussion.

8. Excepting dictum in Rand v. Lockwood, 4 Cir., 1927, 16 F.2d 757, at page 759. Even there, it is indicated that proof that the salvaged property would have been replaced is necessary.

the elements in the order as listed in The Blackwall, supra, and it is convenient to show the court's application of them in tabular form:

| Elements | The District Court's Application |
| --- | --- |
| (1) Labor expended by the salvors | Small in comparison with other cases. |
| (2) Promptitude, skill and energy displayed by the salvors | Of a high order. |
| (3) Value of property employed by salvors, and the danger to it | Not involved in this case since no claim is being made by the United States, the owner. |
| (4) Risk incurred by salvors | Not great. Special allowance made for those who boarded the Else Basse. |
| (5) Value of the property rescued | Cargo valued at $95,324.37. |
| (6) The degree of danger from which the property was rescued | High. |

———◆———

It is difficult indeed to find that the decision of the court below, with respect to the efforts of the crew members of the LST-287 was "clearly erroneous".[9] However, the district court made no division by ships, stating that both ships contributed "substantially and almost, if not quite, equally to the success of the operation." With this we disagree. While we keep in mind that doubt in this judgment should be resolved in favor of the trial court,[10] which heard the testimony and saw the witnesses, we believe the record amply demonstrates that the success of the salvage operation depended largely upon the efforts of the crew of the LT.

It was the promptitude, skill and energy of the crew of the LT which reduced the raging fire aboard the Else Basse to the point where the ship and its cargo became manageable. The LST did not participate in this phase of the salvage at all. It was the daring of Wingert and Keith in securing the tow that first put the Else Basse under control. It can hardly be disputed that the degree of danger to which the cargo was exposed at 5:30 A.M. when the LT appeared on the scene was considerably greater than that to which it was exposed when, after the towing began, fire again broke out which the LST extinguished.

We do not slight what was done by the LST. We accept that the reason for the LST's failure to join in the salvage effort earlier than it did was that it was not so well equipped to fight fire as was the LT. But by the time the LST began to participate, the climax had been reached, the success of the operation reasonably assured. The risk to the crew members of the LST who boarded the Else Basse had been reduced for others had gone before and the danger of boarding had been breached.

9. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.

10. The Kia Ora, 4 Cir., 1918, 252 F. 507, 509.

We cannot say that so far as the LST is concerned the amount of the reward is inappropriate. The assessment of the elements of the salvage award as applied to the crew of the LST appear to us to be meet. However, as the circumstances demonstrate, the amount of the award granted to the salvors on the LT seems to us to be extraordinarily low. While hindsight demonstrates that the degree of danger was not as great as the salvaging seamen might perhaps have anticipated and this is a fact which an admiralty court must take into consideration, nonetheless a salvaging operation on a burning vessel at dawn on the high seas is a treacherous and difficult task and one not lightly to be embarked upon. The compensation to the crew of the LT should be trebled. Public policy is contravened by scanty awards to salvors. Lago Oil & Transport Co. v. United States, 2 Cir., 1956, 232 F.2d 238. Although the amounts of the awards as increased are not great compared to the effort expended and the degree of danger to which the crew of the LT was exposed, the awards, in all probability, would have been substantially higher if service of process could have been obtained against the ship. While the salvage is entire, the owner of the cargo is not jointly liable for the entire salvage effort.[11] The burden of the salvage effort does not fall upon the owner of the cargo simply because another who should have borne this burden has escaped the jurisdiction of the court.

There is yet another limitation upon the recovery by the crew. The owner of the salving vessel has also a claim against the owners of the salvaged property. The usual apportionment, as pointed out by the court below, is two-thirds to the owner of the salving vessel and one-third to the crew.[12] The fact that the owner of the two salving vessels, the United States, has waived its right to claim salvage, cannot and should not benefit the crew.[13]

The decree of the district court will be modified by increasing the award to the crew members of the LT-1953 by $4,600, which amount will be distributed in the same proportion as now set by the district court.

---

11. Stratton v. Jarvis, 1834, 8 Pet. 4, 33 U.S. 4, 8 L.Ed. 846.

12. Gilmore & Black Admiralty § 8-11 (1957).

13. United States v. Central Wharf Towboat Co., 1 Cir., 1924, 3 F.2d 250; Puget Sound Tug & Barge Co. v. Waterman S.S. Corp., D.C.N.D.Cal.1951, 98 F.Supp. 123, 128, affirmed 9 Cir., 1952, 199 F.2d 600.