Booth, Judge,
delivered the opinion of the court:
The plaintiff, a West Virginia corporation engaged in rendering salvage service, sues for an award for such services rendered to the steamship Graf Waldersee. The plaintiff maintains a large fleet of steamers, derricks, tenders, and other necessary and rpodern equipment for the sole purpose of salvaging distressed and stranded vessels. The personnel of its organization is complete and efficient. In order to be within easy access, two stations have been established, one at New York and the other at Norfolk, Va., the plaintiff being enabled to perform both harbor and offshore service.
The steamer Graf Waldersee was an ex-German vessel. She was in the possession of and operated by the United States under an international arrangement between the allied and associated powers, Germany, and the United States. *311 At the time of the accident here involved she was engaged in transport service under the direction of the War Department. and manned by officers and crew of the United States Navy under the direction of the Navy Department.
On June 11, 1919, the Graf Waildersee was en route to Brest, France, from New York. There were 600 people on board, 40 officers, 550 men, and 10 passengers, as well as 3,200 tons of coal and about 1,500 tons of provisions. She carried no other cargo, the voyage being destined for the transport of American troojrs from abroad to the United States. At a point about 25 miles from Ambrose Lightship, in latitude 42 degrees 17 minutes north and longitude 73 degrees 18 minutes west, the steamer Bodondo, during a fog, ran into her, striking her on her port side about 350 feet from the bow. The collision occurred at 10.59 o’clock p. m. The collision was a serious one. The damage occasioned by the Bodondo threatened the safety of the Graf Waldersee and her crew. The immediate danger was in fact so imminent that at 11.02 p. m. S O S calls were dispatched, 10 of the ship’s lifeboats had been lowered, and all nonserviceable members of the crew and passengers had been lined up in readiness to go to the lifeboats.
The area of the Graf Walder see damaged was at the coal bunkers alongside the fireroom, and the fireroom was immediately filled with water to such an extent that within a comparatively short time steam pressure was reduced to the extent that the foghorn was barely audible at a distance of 500 feet. The vessel’s winches were without power and the lights were all out. Kadio transmission was available only through emergency sources, and, taken all in all, the situation was most critical. Designated members of the crew worked heroically in an effort toward temporary repairs; collision mats, tarpaulins, blankets, mattresses, hammocks, and all other available factors were employed in stuffing up the hole in an effort to save the ship. The steamer Patricia, a sister ship of the Graf W alder see, responded to the ship’s SOS and arrived alongside about 12.43 o’clock the following morning. At this moment nearly 100 of the ship’s crew and all passengers were in the lifeboats, and at 1.03 o’clock were *312 taken aboard the Patricia, thus fully attesting the fact of imminent peril to the vessel itself.
Without going into infinite detail, we may observe at this point that despite the efforts of the crew, working steadily with the resources at hand, the water continued to advance, coming in first in one place and then another, until finally the commanders of the vessels reached a decision to tow the damaged ship to the nearest beach. At 3.20 a. m. the Patricia made fast two 8-inch hawsers and the towage started. About 7 o’clock in the morning the tugs Holtex and Margaret Sanford arrived; both took a line to Graf Waldersee and assisted in the towing. In the early morning hours of June 12, 1919, the plaintiff was requested, through the office of the commandant of the third naval district of New York, to go at once to the assistance of the Graf Waldersee. The plaintiff’s steamer Resolute, being immediately ready for service and fully equipped with both crew and wrecking appliances, put out from Stapleton, Staten Island, at 3 o’clock a. m. 'and arrived alongside the Graf Waldersee at 1.20 a. m. She was then in tow 22 miles southeast of Am-brose Lightship in 16 fathoms of water. Her engine room was full of water, with 18 feet of water in hold No. 5, 15 feet in hold No. 6, and 13 feet in hold No. 7.
The Resolute at once attached herself to the ship and placed on board her two 6-inch pumps and began pumping from 700 to 750 gallons of water a minute. At 9.30 a. m. the personal effects of the crew of Graf Waldersee were placed on board the Resolute, and at 10.20 a. m. the plaintiff added the towage service of the tug Jimo~ in the effort to reach a beach. At 10.45 a. m., after having been towed 22y2 miles, she was beached at a point 2 miles from the south shore of Long Island, near Long Beach. She lay with her head toward the beach, resting on a sandy bottom in 6% fathoms of water forward and 7 fathoms aft. The Patricia was unable to complete the beaching of the ship because of danger to herself. Beaching was accomplished by the ship’s own momentum, aided by the tugs. She dropped her own bow anchor; the Juno carried out her stern anchor and carried back the persons on board the Patricia to the ship, *313 after which the Patricia continued on her way. The Resolute, from the inception to the completion of the towage, had pumped about 525 tons of water from hold No. 7, and checked the inflow into holds Nos. 6 and 7 by tying mattresses around the openings in ventilators. That this service was effective is demonstrated by the precarious condition of the ship when beached. She was obviously in dire distress and fortunate in reaching a shallow sea just when she did.
Following the beaching of the ship the plaintiff found it necessary to require assistance, and in response to a call therefor the plaintiff dispatched the wrecking barge Chit-tenden in tow of the steamer Chapman Brothers, both vessels reaching the wreck at about 7 p. m. of the 12th. On the morning of the 14th plaintiff’s steamers Rescue and Relief joined its fleet, the latter carrying the plaintiff’s superintendent of salvage, who immediately took charge of operations.
The findings disclose in detail what was thereafter done. It is not denied that the plaintiff, by employing all its immediate resources and through the instrumentality of powerful pumps and sea divers, succeeded finally in bringing about such a condition that about 3 o’clock p. m. the Graf ~Wol-der see was afloat, and thereafter towed by the plaintiff’s and Government’s vessels until finally placed on dry dock on the afternoon of June 19. It is fairly conceded by the defendant that the services rendered by the plaintiff were substantial and performed expeditiously, and while the assertion is made that the dangers of the situation were more potential than real, the principal objection to a claimed award is a protest against its ascertainment upon a percentage basis.
The Graf Waldersee was a steel twin-screw steamship, •561.2 feet long, 62.2 feet in width, and 37.7 feet in depth. She was built in 1898 in Hamburg. Her gross tonnage was 13,193 and her net 8,375. She was easily worth $1,500,000. She was at the time of the accident especially available as a troopship, having been refitted for the purpose. The cost of repairing the damage done her totaled $81,814.39, and coal to the amount of $25,808 was saved. The value of plaintiff’s vessels and equipment employed in the service is *314 accurately given in Findings VIII and IX, together with damages sustained, as well as the cost of operations.
Deducible from this record is the indisputable conclusion that the plaintiff is entitled to a most substantial award. The plaintiff’s vessel, the Resolute, responded promptly, and, while emergency measures of real merit had taken place prior to her arrival and the distressed ship was in tow, these facts in nowise discredit or seriously minimize the service of the plaintiff from its inception to the close of the successful salvage of the ship. The plaintiff was experienced in salvage service. Its crews, divers, and men were expert in the same. The stranded ship and its (crew, while efficiently cooperating with all the plaintiff did, nevertheless recognized the commanding importance of the plaintiff’s presence and yielded willing obedience to its adopted measures of obtaining relief. As said by the court in the case of the City of Worehester, 42 Fed. 916:
“An important element which enters into the determination of the amount due upon the libel in rem is the fact that each salvor is an owner of a valuable plant which is constantly ready for service and equipped with a crew which is constantly under pay. The calls for salvage service are occasional. The necessity of the expenditure for wages and repairs is continuous. The Gity of Worcester had the prompt benefit of a large plant, which was itself in some danger of injury.”
It is manifestly idle to hazard a prediction as to what might have happened if the plaintiff’s service had not been available. The salvage service was successful, the ship was saved, and the record is replete with facts which clearly disclose her perilous situation and imminent danger of total loss. Salvage awards are difficult to harmonize. The cases establish no uniform amount. In reaching conclusions the facts of the particular case invariably determine the sum. The established precedents point out the factors to be considered, viz: The value of the vessel and cargo salved, the perils and dangers of her situation when accepting service, the dangers incident to the performance of the service by the salvor, the value of the salvor’s outfit, the actual expense *315 incurred by the salvor, and all other pertinent facts and circumstances connected with and incident to the situation involved. Salvage service, in so far as all the cases cited in the brief indicate, is not to be predicated upon a fixed percentage basis.
A service of this character involves an old and oft-repeated rule of including a sum over and above expense and profit sufficiently reasonable to encourage the service, and take into consideration the important fact that any award whatever depends absolutely upon success. When one is willing to hazard, as was done in this case, almost its complete organization and equipment upon the single factor of success, and finally succeeds as the primary agency in saving a vessel of substantial worth, the award to which it is entitled is, in our opinion, to be fixed at a sum commensurate with the actual work involved and the results accomplished.
The plaintiff contends for an award of $150,000. With this contention we disagree. It is, under the facts of the case, more than the record justifies; $92,500, we think, is sufficient. A careful analysis of the record does, in our opinion, sustain an award for this sum, and judgment will accordingly be awarded the plaintiff for $92,500. It is so ordered.
Moss, Judge; Graham, Judge; Hat, Judge; and Campbell, GMef Justice, concur.